IN THE MATTER OF THE APPLICATION FOR THE COM-
MITMENT TO AND CONFINEMENT IN THE NEW JER-
SEY STATE HOSPITAL AT GREYSTONE PARK OF
DOROTHY TRUSLOWE, AN ALLEGED INSANE PERSON.

The Juvenile and Domestic Relations Court of the
County of Morris

Decided October 5, 1956.

*Mr. Harry Sears* argued the cause for the applicant, Edward T. Truslowe (*Messrs. Young & Sears,* attorneys).

*Mr. Marius Grosso* argued the cause for the adjuster of the County of Morris.

MINTZ, J. C. C.    Dorothy Truslowe was arrested May 28, 1956- by the Madison (Morris County) police on a "bad check" charge, arraigned before the magistrate of the municipal court, and lodged in the Morris County jail awaiting grand jury action.    The following day the warden of the Morris County jail made application for her transfer to and confinement in the New Jersey State Hospital at Greystone Park.    The application was supported by the physician's certificates required pursuant to *N. J. S. A.* 30:4–29, where insanity is involved.

An order instituting inquiry was duly entered, and proofs taken before the county adjuster as to the insanity, indigency and legal settlement of said Dorothy Truslowe.    In accordance with the findings of the county adjuster this court on June 27, 1956 entered a final order of commitment wherein it was determined that said Dorothy Truslowe be confined in said State Hospital, that she has a legal settlement in Bergen County, and that her care and maintenance while a patient in said institution be chargeable to her father Edward T. Truslowe, at the prevailing non-indigent rate.

Mr. Edward Truslowe now applies to this court for an order modifying the final order of commitment so as to relieve him from the financial responsibility for the care and maintenance of his daughter at the institution, contend-

ing it should be imposed on the County of Bergen. He does not challenge the finding of insanity, legal settlement, or deny his financial ability to make such payment. He urges that these proceedings were initially instituted under *N. J. S. A.* 30:4–82, and that it is the clear intent of this statute that responsibility for care and maintenance in the instant case should be borne by the county of legal settlement, and that if there is no legal settlement, it should be borne by the State. His daughter has a legal settlement in Bergen County, and therefore he contends that her care and maintenance while a patient at the State Hospital is the responsibility and obligation of that county, and not his. He further argues that by the provisions of *N. J. S. A.* 30:4–25 it was the clear intent of the Legislature to provide a separate and different procedure with respect to a patient transferred from a correctional institution to an institution for treatment, and this section in the statute characterizes such a commitment as "Class E" and expressly states that "In all such cases the procedure shall be governed by the provisions of *section* 30:4–82 of this title." A reading of the cited sections in the statute to the exclusion of all the other related provisions would tend to support such contention. Such a limited consideration is, however, contrary to established rules of statutory construction.

The proper rule of statutory construction is expressed in the case of *In re Huyler,* 133 *N. J. L.* 171 (*Sup. Ct.* 1945), where the court concerned itself with the same *Title* 30. The court there said:

"It is a primary canon of construction that the provisions of statutes *in pari materia* shall be reconciled and harmonized, if possible, into a consistent, homogeneous whole. *Crater v. County of Somerset,* 123 *N. J. L.* 407; *Broderick v. Abrams,* 116 *N. J. L.* 40. This rule is in aid of the discovery of the legislative intent, and its application is circumscribed accordingly. The effectuation of the legislative will is the end to be served in the exposition of statutes; and this of necessity calls for an accommodation of apparent conflicts to advance the essential statutory policy, giving to each clause a meaning not in opposition to the related provisions, if that is reasonably consonant with the terms employed to voice the legislative design. The literal import of the terms ofttimes gives

way to the outstanding legislative purpose, considering the particular statute in relation to statutes *in pari materia.* * * *"

In order to ascertain the legislative intent and purpose it is necessary not only to analyze *N. J. S. A.* 30:4–82 and *N. J. S. A.* 30:4–25, but also to examine the related provisions in *N. J. S. A.* 30:4 pertaining to maintenance of patients in state institutions.

*N. J. S. A.* 30:4–25 expressly refers to *N. J. S. A.* 30:4–82 as a procedural statute. *N. J. S. A.* 30:4–82 appears as a section under *article* 4 of *chapter* 4 entitled *"Confinement and Transfer of Inmates."*

*N. J. S. A.* 30:4–27 provides that:

"A person alleged to be insane may be committed to and confined in any institution for the care and treatment of the insane in this State * * * by the person having the charge or care of such patient * * * or by any chief of police or police captain of any municipality in this State where such patient may be, or by the chief executive officer of any correctional institution * * *."

The warden of the Morris County jail is the chief executive officer of that correctional institution, and certainly Dorothy Truslowe, when confined to the jail, was under his charge and care. The proceedings under this section of the statute expressly contemplate a transfer from a correctional institution to an institution for the insane. The proceedings in the case at bar were presumably and properly initiated under *N. J. S. A.* 30:4–27 and not *N. J. S. A.* 30:4–82.

The responsibility for the care and maintenance of patients confined in state or county institutions is expressed in *Title 30, chapter 4, article 3, subdivision* D, entitled, *"Commitment And Maintenance Of Patients";* and it is here that we must look for an expression of policy and legislative intent in this respect. Specifically, reference is made to the following:

*N. J. S. A.* 30:4–60

"If the court shall determine that the patient is insane and has sufficient estate to pay for his full maintenance as fixed by the board of managers or board of chosen freeholders, as the case may be, or

if the person or persons legally liable for his support, as herein provided, are able to pay for his maintenance, fixed as aforesaid, the court, after determining the legal settlement of such patient may, in its discretion, commit such patient to any State or county institution for the care and treatment of the insane in this State. In the final judgment of commitment it shall direct that the care and maintenance of such patient in the institution designated in the judgment shall be paid out of the estate of the patient or by the person chargeable by law with his support, or by contract, as the case may be, \* \* \*."

*N. J. S. A.* 30:4–66 provides that

"Every patient supported in a State charitable institution shall be personally liable for his maintenance and for all necessary expenses incurred by the institution in his behalf and the husband, father and grandfather, mother and grandmother, and the children and grandchildren, severally and respectively, being of sufficient ability, and the wife, if she is in sufficiently comfortable circumstances, of every patient so confined, whose estate is not sufficient for his support, shall support, and maintain the patient in the institution in such manner and to such an amount as the court shall direct. \* \* \*"

*N. J. S. A.* 30:4–74 is to the effect that

"A patient's estate or the person chargeable for his support, or the state or county as provided by law, shall be liable for institutional support from the time of the patient's commitment whether he was committed as indigent or nonindigent and irrespective of change of status after commitment."

*N. J. S. A.* 30:4–68 simply provides that in cases where an indigent patient has a legal settlement in any county in this State, the cost of his care and maintenance shall be borne by such county, and *section* 69 immediately following provides that the cost of care and maintenance of an indigent patient having no legal settlement in any county shall be borne by the State.

*N. J. S. A.* 30:4–80.1 imposes a lien on property of *all* persons committed under *Title* 30 in a state or county charitable institution for the cost of the care and maintenance of the patient in such institution.

The obvious design of these sections in the statute was to impose responsibility for the care and maintenance of the patient in the institution, primarily on the patient

and his property; and if his funds are inadequate, then on the specified members of his family. If they are unable to make such payment, then upon the county of legal settlement, and finally, on the State, in the event the indigent patient has no legal settlement in any county.

In *Freeholders of Camden v. Ritson,* 68 *N. J. L.* 666 (*E. & A.* 1903), the court, in referring to a statute similar to *N. J. S. A.* 30:4–66, said:

"As to the first contention, the statute is a sufficient answer. It says specifically that every insane person supported in any county insane asylum shall be personally liable for his maintenance therein. This applies to a married woman as well as *to any other person.*" (68 *N. J. L.,* at *page* 668)
"Every" means *every.*

But how is this conclusion reconciled with *N. J. S. A.* 30:4–82? That section provides that

"If any person in confinement under commitment, indictment or sentence, or under any process, shall appear to be insane, epileptic, imbecile or feeble-minded, the County Court of the county in which such person is confined, or the Superior Court, may, in an action like an action for commitment, determine the mental or physical condition and legal settlement of such person. Pending the action such person may be temporarily confined in an appropriate public institution in this State, upon an order of the court.

If the court shall determine that said person is insane, epileptic, imbecile or feeble-minded, it shall direct that such person be removed from imprisonment, and that he be confined in one of the institutions for the care and treatment of such persons owned by this State, or if it shall deem it advisable, in an institution for the care and treatment of such persons owned by one of the counties of this State until such person is cured or removed or discharged according to law. The court shall also make a determination of such person's condition, and if it shall find that such person has no legal settlement in any county in this State, he shall be maintained in such institution at the expense of the State, and if he has a legal settlement in any county in this State he shall be maintained by such county. * * *"

Significantly, the permissive term "may" is used in the first paragraph of *section* 82 describing the procedure. Impliedly, if this optional procedure is not used, the warden can proceed under *N. J. S. A.* 30:4–27, and in such case *N. J. S. A.* 30:4–60 and 66 would unquestionably apply.

The second paragraph of *section* 82 initially provides that if the court makes a determination of insanity, it shall direct removal of such person from imprisonment to an institution for the treatment of such person. It then states that "The court shall also make a determination of such person's condition," and if he has no legal settlement in any county of this State, he shall be maintained in that institution at state expense, and if he has a legal settlement in any county, then at the expense of that county. It may be argued that in imposing the duty on the court of *also* making a determination of his condition, the term "condition" in its context means "financial condition," and when the statute goes on to provide for his maintenance at the expense of the State or county, as the case may be, the assumption is that there is a finding of indigency of the patient and his relatives. Or, it may be reasoned that the purport of *section* 82 is to merely determine the primary liability between the county and State, using that term in the same sense as it is used in *N. J. S. A.* 30:4–73, "The court shall find as a fact and the final judgment of commitment shall set forth whether the plaintiff is indigent * * *." *Section* 82, if so construed would simply provide that the county or State as the case may be, would be primarily liable for the maintenance of the patient until the financial position of the patient and his relative is ascertained.

It is unnecessary to determine which interpretation of *section* 82 should be adopted. Either is consistent with *N. J. S. A.* 30:4–60, 66, 67 and 68, which plainly set forth the order of liability of the patient, his relatives, the county and the State, for the maintenance of the patient.

Applicant's suggested construction of *section* 82 violates the fundamental principles of statutory construction and is contrary to the plainly expressed legislative policy that the patient and his legally chargeable relatives be financially responsible for his maintenance at the institution, and that such liability rest with the county or State, only in the event of their indigency.

The applicant argues that simply because the patient was transferred after a one-day stay from the county jail to the State Hospital, the obligation for her support in the hospital is on the County of Bergen. Concededly, if the patient was admitted to the State Hospital directly from community life, the financial responsibility for her maintenance would lie with her father, the applicant.

There are countless civil patients in state institutions who are supported in whole or in part by their own funds or their legally responsible relatives. To require these persons to meet this obligation and at the same time exempt a person accused of committing a crime, and his relatives, simply because that person entered the State Hospital via a transfer from jail, is an illogical and unjust conclusion which this court refuses to accept.

The unsoundness of the applicant's position is further demonstrated by this conceivable situation. The "bad check" charge is a bailable offense. If Dorothy Truslowe had been released on bail, and entered the hospital the following day either voluntarily or on application of a relative or other interested person specified in *section 27*, she certainly would not at that time be in "confinement," and obviously *section 82* would not apply. By the simple device of not electing to bail his daughter out of jail, the applicant makes it possible to escape liability for her support in a State Hospital. The court rejects a statutory construction that would effect such obvious inequities. Certainly, it was not the legislative intent that a person in jail accused of crime and awaiting grand jury action, if determined to be insane, be transferred to and maintained at a State Hospital at county or state expense, while another person similarly accused, but released on bail, awaiting grand jury action, if determined to be insane, be so admitted, and maintained at his or her family's expense.

The motion is denied.